a fundamental element of the crime. We are unable to subscribe to this argument.

The issue of operability was never raised. There was no evidence in the case which might have conflicted with the inference. Moreover, we view the proof of possession of a gun to comprehend that the gun is operable, under *Schultheis*, and that a factual issue as to the operability may only be raised where other evidence conflicts with the inference of operability. Accordingly, defendant's arguments under this point are not persuasive.

IV

Defendant finally contends that his sentence of 14–24 years in State Prison was manifestly excessive.

The presentence report indicates that the present offense occurred while defendant was an escapee from N. J. State Prison, where he was serving 18-23 years. In consideration of his long history of violent offenses, the present sentence does not appear to be unduly punitive or to constitute an abuse of the discretion inherent in the sentencing judge.

Inasmuch as we find that no prejudicial error tainted the convictions, they are

Affirmed.

IN THE MATTER OF THE 1976 HOSPITAL REIMBURSE-
MENT RATE FOR WILLIAM B. KESSLER MEMORIAL
HOSPITAL.

Superior Court of New Jersey
Appellate Division

Argued October 24, 1977—Decided November 14, 1977.

Before Judges ALLCORN, MORGAN and HORN.

*Mr. Charles Lee Harp, Jr.* argued the cause for appellant Kessler Memorial Hospital (*Messrs. Archer, Greiner & Read,* attorneys).

*Ms. Charlotte Kitler,* Deputy Attorney General, argued the cause for respondent Department of Health (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Ms. Erminie L. Conley,* Deputy Attorney General, on the brief).

*Mr. Peter T. Manzo* argued the cause for the Public Advocate.

PER CURIAM. This appeal arises under the Health Care Facilities Planning Act (*N. J. S. A.* 26:2H-1 *et seq.*) and the 1976 Hospital Rate Review Program Guidelines estab-

lished by the Commissioners of Health and Insurance. William B. Kessler Memorial Hospital (Kessler) appeals from the December 10, 1976 decision of the Commissioner of Health adopting *in toto* the recommended findings and conclusions of the hearing examiner which denied Kessler's appeal of Department challenges to Kessler's proposed budget for 1976. The decision resulted in establishment of Kessler's "final administrative rate" for 1976, the *per diem* payment which, after some adjustment not here pertinent, Kessler will receive from Blue Cross and Medicaid for its covered patients.

In 1975 the Department of Health began development of a program of uniform cost accounting for hospital and reimbursement rate review pursuant to the Health Care Facilities Planning Act, *N. J. S. A.* 26:2H–1 *et seq.* In accordance with the Department's 1976 Guidelines for this program, Kessler submitted its proposed budget for 1976. After analysis by Department of Health analysts, two items in the budget were challenged — emergency rooms costs and newborn care center costs. Kessler took an administrative appeal (*N. J. A. C.* 8:3–3.1 *et seq.*), pursuant to which a hearing relating to the two contested items was held.

The evidence adduced therein disclosed the following: Kessler is situated in a rural area on the outskirts of Hammonton, between the major highways carrying traffic to and from the Philadelphia metropolitan area and the New Jersey resorts of Atlantic City, Ocean City and points south. The White Horse Pike, the Black Horse Pike and the Atlantic City Expressway are major traffic arteries in close proximity to the hospital. It is the only immediately available hospital for the area, the next closest one being more than 20 miles away. Because of these facts a significant number of emergency patients are received in Kessler's emergency room. Cardiac patients, accident victims and victims of crime are typical of the emergencies handled in this facility.

Central to the dispute concerning the costs of this facility is the cost attributable to the employment of licensed physicians to provide a 24-hour-a-day coverage for the emergency room. Until July 1975 Kessler had staffed its emergency room with interns, *i. e.,* nonlicensed physicians, at a salary of $4.70 an hour. In response to an incident (rape victim being brought to the hospital and no licensed physician present to examine her) the principal field representative for the Department of Health, Mrs. Pabian, was sent to Kessler to determine whether such an incident resulted from violation of section III, Q7B of the *Manual of Standards for Hospital Facilities* (1972) which provides:

Q. All hospitals applying for license shall provide the following professional departments, services and facilities:
   7.7 Accident-emergency services

\*        \*        \*        \*        \*        \*        \*

   B. All hospitals shall provide twenty-four hour licensed physician coverage in the emergency department according to a plan established by the medical staff and/or approved by the governing board. There shall be a licensed physician responsible for the prompt and efficient treatment of all emergency patients.

Despite the ambiguity that the Department sought to inject into this seemingly clear provision, there is no doubt from the record of Mrs. Pabian's testimony that she told Kessler, during her visit to that facility, that licensed physician coverage on a 24-hour basis was required. Although she was, of course, concerned over Kessler's then existing practice of staffing its emergency room with unlicensed physicians, her order was not confined to correcting that deficiency but was unequivocal as to her demand, in accordance with her interpretation of the regulation, that licensed physicians cover the emergency unit 24 hours a day.

It was further her testimony that a house physician doubling as one covering the emergency unit would not constitute sufficient compliance with the regulation, and should she encounter any such plan for coverage she would cite that

hospital for a violation thereof. The only exception was in the case of hospitals handling a low volume of emergency cases, those with less than 6,000 such cases a year. Kessler handles over 11,000 and hence would not be excused.

According to Kessler, by testimony uncontradicted and undisputed, the only way in which it could secure the required emergency room coverage was to do what it did, hire physicians for that purpose. Since it had no house physicians in its employ, none could be relied upon to service emergency room cases even were such a procedure considered compliance with the regulation in question. And if it did hire such a house physician, as the Public Advocate seemed to suggest during the hearing that it do, that physician would have to be paid, and presumably at the same rate being paid the physicians who staffed the emergency room. As far as we could discern from the record, such a procedure would result in no dollar savings for the hospital although, perhaps, through allocation to a different cost center it might meet with Department approval.

Kessler's disinclination to rely upon staff physicians was not irrational. Staff physicians, those not paid by the hospital but who, in exchange for the privilege of treating their own private patients in the facilities, contribute on a voluntary basis to other hospital services, may not be immediately available when an emergency patient is brought in. Clearly, Kessler's concern that emergency patients would not receive the immediate attention they need by such staff physicians was not an unfounded one. Indeed, the essential rationale for the Department's regulation is plain. Accidents and severe sudden illness occur at all times of the day without warning. When the emergency patient arrives at the emergency room, he needs immediate attention from a qualified physician. Any delay in the delivery of such services may result in death or other consequences of magnitude.

Thus, there was no way to provide for the required service except by hiring physicians to perform it. It was the cost entailed by compliance with this Department regulation, as

interpreted by Mrs. Pabian, that was disallowed by the Department itself.

The Department's initial challenge to the projected budget for emergency room facilities stemmed from the fact that on a "peer comparison" with a median cost per visit figure generated from other supposedly comparable hospitals, it was found that Kessler's unit costs were higher than the median. Kessler contended that the hospitals whose "unit costs" were used to arrive at the median figure were simply not comparable with Kessler. For example, it noted that Franklin Hospital had no cost in the emergency room because the extremely low volume of emergency cases was handled by staff physicians only. Elmer Community Hospital had no emergency room at all, handled its low volume of emergency cases during the day by staff physicians, and only paid for two, rather than three, shifts of emergency coverage. At Alexander Linn eight months of emergency service was handled by staff physicians; that hospital reflected only four months of emergency physician costs.

The hearing examiner, whose report was finally accepted by the Commissioner, upheld the entirety of the Department's challenge to Kessler's 1976 budgeted emergency room costs, making no finding whatsoever regarding Kessler's contention that the hospitals to which it was being compared were not fairly comparable. Rather, he concluded that the Department regulation in question did not compel licensed physicians to be assigned emergency room coverage on a 24-hour basis.

His interpretation of the regulation as not requiring the "physical presence" of physicians in the emergency room is beside the point. Whether they are in the next room, or down the hall, or in the other portions of the hospital is not the question as long as their prime responsibility is the emergency room and their immediate availability is assured should an emergency require such services be received in that room. Everything in this record supports this conclusion. We can find nothing in the record to support the hearing examiner's conclusion that Kessler failed to meet the regula-

tion's requirement "subsequent to July 1975, by not providing a *plan* of coverage to *meet its needs.*" (Emphasis by the examiner). Kessler did more than submit a plan; it implemented one.[1] Indeed, had all Kessler done in compliance with Mrs. Pabian's order and the regulation she was enforcing was to submit a plan, there would be no question as to its violation of the regulation. Moreover, although the examiner required a "plan" rather than action to meet emergency needs, he never determined that a plan or action other than the one implemented by the hospital existed which would pass Department muster.

Finally, we are constrained to add that use of median unit cost comparison must be done with judgment. For example, if "peer" hospital costs are lower because of their failure to comply with Department regulations, holding other hospitals to such lower costs may indeed lower costs but at the sacrifice of essential medical care. And it should be remembered that one of the purposes of the Health Care Facilities Act, *N. J. S. A.* 26:2H–1, was the providing of "hospital and related health care services of the highest quality * * *." Also, in order to have any utility, the median unit costs compared must be derived from hospitals which are truly comparable. Here, despite evidence of significant differences between Kessler and the "peers" to which it was compared, no finding was made that they were comparable and how their differences, if any, were, or were not, significant to their cost experience. And in no event should the median be used as an absolute standard; rather it should be used as a device to locate those costs needing further investigation as to their justifiability.

---

[1] The examiners' conclusion that emergency room staffing was motivated "solely with an eye toward avoiding further citations for failure to comply with the State Standards" is particularly worthy of note. If they had not sought to comply, they would have been in violation; having sought to comply, they are condemned for doing so. As for the staffing being in excess of needs, the regulation preempted Kessler's discretion concerning its needs.

With full awareness of our traditionally limited scope of review in cases implicating agency expertise, we are nonetheless compelled to view the disposition of Kessler's appeal to Department challenge to the proposed budget for 1976 emergency room costs as without evidential foundation in the record and as an arbitrary and capricious one.

■ Much the same can be said with respect to the Department's disposition of Kessler's appeal from the challenge to the newborn care center. This aspect of the appeal concerned the Department's challenge to $12,000 of the new born care center portion of the hospital's proposed 1976 budget and also rested on its proposed costs falling outside the peer comparison median range. This challenge too was a direct result of Kessler's compliance with Department regulations rendered costly because of a relatively low number of newborn patients, giving rise to higher than median cost per patient.

The maternity department at Kessler is divided into three areas. One is a mixed obstetric and gynecologic floor, with 10 beds, used for post-partum and gynecology. The other two are a nursery and a labor-delivery room.

Department regulations require the presence of a registered nurse in the labor-delivery room at all times during the day and night. Hence, regulation 8.804 of the *Manual of Standards for Hospital Facilities* (1972) provides:

B. There shall be at all times, day and night, **registered professional** nurse supervision of the nursing care of mothers and infants, and such other nursing supervision and coverage as is required.

Furthermore, § III 4 of the *Revised Criteria for Mixed Obstetrics and Gynecologic Floors* issued by the Department of Health provides:

Nurses working on the non-segregated service [obstetrics and gynecologic] may not be assigned to the labor room, delivery room or newborn nursery during the same tour of duty without the necessary scrub and gown change. In no case may a nurse from a department other than the maternity division be assigned to the non-segregated service during the same tour of duty.

Thus, nurses may not go from the mixed department to the nursery or the labor-delivery room unless they have showered and scrubbed down; nurses from the general part of the hospital may not be pulled into the labor-delivery or nursery rooms.

Section 8.804A of the *Manual of Standards for Hospital Facilities* (1972) also requires a registered nurse present in the obstetrics room at all times unless an exception has been obtained:

Separate personnel shall be assigned to the obstetrical service which shall be under direct supervision of a registered professional nurse at all times. If the case load does not justify the total time of one nurse on each tour of duty, exception may be made by the action of the licensing board after submission and approval of written techniques. In the event that exception is granted, such techniques shall be posted in the obstetrical unit and all personnel instructed.

Indeed, Kessler petitioned the licensing board pursuant to § 8.804A, *supra,* so that it would not be required to have a registered nurse in the obstetrics room at all times. This petition was denied.

The only exception to this requirement permits use of a licensed practical nurse instead of a registered nurse when there are less than two babies in the nursery and their condition does not warrant presence of a registered nurse. The record, however, discloses that despite the low volume of newborn babies at Kessler (only 300 a year), these births are not evenly spaced as one might expect. Hence, there frequently are more than two babies in the nursery at any one time. Furthermore, babies in poor condition are frequently encountered and require the presence of a registered nurse.

Kessler's nursery was surveyed by the Department of Health Licensing Board in 1974 and 1975. In each survey Kessler was noted to be in violation of these regulations for failure to have professional registered nurse supervision for mothers and infants. Kessler's attempted compliance with these regulations, costly because of its low volume, generated the costs which were disallowed.

Although the hearing examiner recognized that Kessler had attempted to, but could not, obtain an exception from the Department of Health to the regulations requiring full-time registered nurse care, and that Kessler was fully complying with state mandates as to staffing its newborn facilities in a highly efficient and effective manner and that under-utilization of newborn services substantially contributed to the $12,000 challenge[2], he upheld the entirety of the Department's challenge. Curiously, he noted that "economies could be made by the hiring of L.P.N.'s (licensed practical nurses) instead of RN's," a direct violation of Department regulations which Kessler had been unsuccessful in getting relaxed. Again, we conclude that such action can only be regarded as arbitrary and without relation to the evidence presented.

The decision of the Commissioner of the Department of Health, dated December 10, 1976, as to the two challenged items is reversed and the matter remanded to the Department for recalculation of the *per diem* rate for 1976 in conformity with this opinion.

---

[2]During oral argument Kessler advised us that their newborn center is being discontinued for underutilization. Such fact does not, however, affect conditions as they existed in 1976.